**Ann Ferrell DACUS, Plaintiff,**

v.

**SOUTHERN COLLEGE OF OPTOMETRY, Defendant.**

No. 78–2026.

United States District Court, W. D. Tennessee, W. D.

July 3, 1979.

Phillip E. Kuhn, Memphis, Tenn., for plaintiff.

Hunter K. Cochran, Jr. and Melvin Fleischer, Memphis, Tenn., for defendant.

## MEMORANDUM DECISION

McRAE, District Judge.

This is the suit of a former employee of the defendant seeking monetary and injunctive relief, including reinstatement. Plaintiff brings the suit pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e et seq. She charges that the defendant discriminated against her because she is a female in that she was paid less than male employees who were assigned similar jobs and that the defendant retaliated against her for filing a discrimination charge with the EEOC.

The defendant is a general welfare corporation. It is owned by a Board of Trustees which also establishes the policies of the college and elects the officers. The defendant college, as its name reflects, operates an educational institution which grants degrees in the field of optometry.

During most of the period involved in this lawsuit the three highest ranking officers who were charged with administering the affairs of the college were Dr. Spurgeon Eure, the President; Dr. Vonne F. Porter, the Executive Vice President; and Claude Pullen, the Administrative Officer or Secretary-Treasurer. In the hierarchy Dr. Eure was the chief executive of the institution. Most of the personnel decisions were handled by the Executive Vice President, who in turn delegated much of the supervisory function of the business affairs to Claude Pullen.

The proof the plaintiff offered established that the administrative hierarchy of the defendants, consisting of the three men referred to above, treated female employees as inferior in many ways and that they exploited them as females, or attempted to do so, in various ways such as taking advantage of the fact that females are secondary wage earners in a family or supporters of themselves only. They also asked sexual favors from the subordinate female employees.

Ms. Doris Bell, who also has a sex discrimination case against the defendant pending in another division of this Court, testified as a witness for the plaintiff in this cause. She corroborated the testimony of the plaintiff to the effect that plaintiff did the work of a previous business manager. She further testified that Dr. Eure had made unmistakable sexual proposals to her and threatened to prevent the issuance of an optometry license to her fiance.

The plaintiff testified that Dr. Vonne Porter, the Executive Vice President, made sexual proposals at work to her and placed his hands upon her in furtherance of the proposals, when no other persons were present. He denies this episode, but he admits that he made advances to Sandra Hodges in the parking lot of the college after they had enjoyed Christmas cheer in the office of Claude Pullen, the Administrative Officer. When he tried to pursue this further by telephoning her and proposing that he see more of her, she rejected him. It should be noted that he contends that she was responsive to his advances in the parking lot and later that night at her home, whereas she testified that she became upset at his sudden advances and did not encourage him.

Ms. Andrea Rankin testified that Claude Pullen made sexual passes at her. She made a complaint about this which ultimately caused the matter to be considered by the Board of Trustees. Mr. Pullen appeared before the Board, which apparently took no action. (There is no proof that the Board heard from Ms. Rankin.) In his testimony in this case Mr. Pullen denied that he made passes at Ms. Rankin, and testified that the only circumstance that occurs to him as a time when Ms. Rankin might have misunderstood him was an occasion when, having suffered a heart attack several days before, he was in Ms. Rankin's office where she was helping him with some outside work and he felt that he had to brace himself, at which time he might have touched Ms. Rankin.

On cross examination Mr. Pullen also acknowledged that Mrs. Aldridge and her husband, in the presence of Dr. Eure, accused him of making sexual advances to Mrs. Aldridge on three occasions. He denies this.

As the trier of facts this Court finds that the incidents described above occurred substantially as the women testified. While the refusal to respond to sexual advances cannot be found to have caused a demotion or termination of a female employee nor the payment of a lesser salary, the attitude

of the male hierarchy of the defendant towards subordinate female employees was one of degradation which demonstrates a willingness and intent to discriminate against female employees.

The plaintiff in this case commenced working for the defendant in 1968 as a faculty typist. She became a secretary to the Business Manager, Howard Hicks, on a partial basis effective April 1, 1970. Effective September 1, 1970, she was appointed secretary to the Business Manager on a full-time basis. She was reappointed for two additional annual terms which commenced July 1, 1971, and July 1, 1972, respectively. This was in accordance with the policy of the school to announce personnel appointments in the spring of the year for annual terms commencing July 1. Of course changes could be made during the year in the event of a promotion or job transfer or termination for cause.

During the time that plaintiff was secretary for the Business Manager she gained a familiarity with the duties and actually, commenced performing some of them under varying degrees of supervision from the Business Manager.

Howard Hicks was fired as Business Manager in September of 1972, effective October 31, 1972, but he left at the end of September. Effective October 1, 1972, the plaintiff was given the job title of Bookstore Manager Trainee; however, her salary remained the same as that which she had been awarded as secretary under her annual appointment. At the time she was Bookstore Manager Trainee she remained in the office space assigned to the business manager and she was told by the Executive Vice President that she was qualified for the job of Business Manager. She assumed the duties formerly performed by the Business Manager except for supervision of some student apartments and the optical shop, which was closed. Later she moved to the desk of the former Business Manager and was assigned a secretary to work for her.

Effective July 1, 1973, for her annual appointment plaintiff was promoted to the "technical and professional" category of the

defendant's personnel. At that time her annual salary was increased from $5,724 to $7,270, and she was given the title of Assistant Business Manager, although there was no person who held the position of Business Manager. Her duties continued as they had been. During the last year that Howard Hicks served as Business Manager he was paid $10,296 per annum.

On March 12, 1974, the plaintiff filed with the EEOC a charge which stated as its basis the following:

I have been denied the title and salary commensurate with work I have performed, as detailed in the attached affidavit and exhibits thereto.

Effective July 1, 1974, the plaintiff was appointed Bookstore Manager based upon a policy recommendation and plan made February 1, 1974, (T.E. 51) to combine the office of Business Manager and the Bookstore into one budgetary department. At that time her salary was increased to $8,496 per annum.

The record reflects that the Administrative Officer became concerned about the plaintiff's job performance, particularly as an administrator, in 1974. On October 7, 1974, the Administrative Officer recommended to the Executive Vice President that the plaintiff be put on a probationary status for the remainder of her then current term, and that she not be given an appointment of employment in the business section after June 30, 1975, the end of her then current term (T.E. 52). Her next annual appointment was as Administrative Aide to the Executive Vice President at a salary of $9,420. At that time a male, Robert G. Hunolt, was hired as Bookstore Manager at the same salary that the plaintiff was being paid.

Effective July 1, 1976, the plaintiff was again appointed Administrative Aide to the Executive Vice President, this time at a salary of $10,236. Effective June 30, 1977, she was reappointed Administrative Aide. However, at this time she was assigned to the Grant Office, which had been developed in January 1977, for 60% of her time. The

remaining 40% of her time was to be devoted to the office of the Executive Vice President. Her total annual salary was increased to $11,256.

In December 1977 her superior in the Grant Office, Dr. Dunsky, gave her an extremely favorable evaluation in all categories except Leadership and Written Communication, in which he gave her zeros on a scale of 0 to 5. However, he recommended her for a salary increase (T.E. 25). By memo dated February 15, 1978, the President notified Dr. Dunsky and the plaintiff that the Grant Office would be abolished at the end of June 1978. He further stated that he would be happy to recommend them for other positions which they might seek, and he invited them to apply for any vacancies at the defendant institution for which they were qualified (T.E. 35).

Plaintiff applied for other positions, but she was not hired for any other position for the stated reasons that she was not qualified or there were others better qualified. In this regard it is noted that she was unwilling to accept a job paying less than she had been making and that she would not accept a clerical job.

Her employment with the defendant was terminated on June 30, 1978.

The proof reflects that the plaintiff and other aggrieved female employees had repeatedly asked for written statements of policy over personnel procedures, but that they were never given satisfactory answers. It is apparent from the proof that Dr. Porter, the Executive Vice President, and Claude Pullen, the Administrative Officer, were the persons who controlled and administered the personnel policies, and that they changed the policies frequently. In this regard one of the most troublesome problems arose over the very complex system for setting salaries. Dr. Porter devised it, Dr. Porter computed it, and only Dr. Porter understood it. It was devised ostensibly as an objective salary index which would apply uniformly for all faculty and technical and professional employees. Perhaps it would apply more uniformly for faculty personnel; however, the record does not reflect its

applicability in that regard. But the record does reflect its ability for maneuverability and arbitrary applicability for the technical and professional personnel who have acquired experience and training on the job and from the clerical ranks. The index consists of four basic factors: rank, degree, longevity, and merit. The rank factor is based upon the position held in the hierarchy of the organization, which can be subjective with regard to some of the lower echelon administrative jobs. The degree factor means whether or not the person has an academic degree. In this category a person with a Ph.D. in Optometry receives a score of .40, whereas a person with only a high school diploma receives a minus .20. A Bachelor of Science degree is only minus .10. This factor is a disadvantage to the plaintiff and other females who acquired their knowledge of their jobs via experience. Furthermore, the various degrees are not job related to some jobs such as Bookstore Manager. The merit factor is an evaluation on performance which is subjective and variable. The longevity factor is designed to compensate for length of service and experience; however, there is authority for the Executive Vice President to give credit for longevity to a new employee for similar experience at other places. This too may be variable.

In summary, the subjective and variable features of the index create a suspicion about its fairness and offer an opportunity for disparate treatment to females.

### Conclusions

Based upon the above facts this Court concludes that the defendant acting through its high ranking male officers did discriminate against the female plaintiff by assigning her substantially all of the duties of the former Business Manager from October 1, 1972, through June 30, 1974. Similarly the discrimination continued the next year when the office of Business Manager was combined with the Bookstore Manager in which position the plaintiff continued until June 30, 1975. The Court further

concludes that the plaintiff is entitled to damages based upon the difference between the salary being earned by Howard Hicks as Business Manager at the time of his termination—$10,296 per annum, or $858 per month—and the amount plaintiff was paid between October 1, 1972, and June 30, 1975. At that time plaintiff was transferred to the job of Administrative Aide to the Executive Vice President due to the appropriate determination by management that plaintiff was not suited to the job which required supervision. While it is true that plaintiff was replaced with a male Bookstore Manager at a salary of $9,420 per annum, this Court concludes that the transfer of plaintiff from the head of the office of the Business Manager to the Bookstore Manager was not intended to be a job of lesser responsibility or effort. Therefore, the plaintiff should have been compensated at the same salary she should have earned while performing the duties of Business Manager.

These conclusions recognize and include a finding that the plaintiff was justifiably demoted to the salary level that she was actually paid from the time that she was transferred to the Administrative Aide position which was in fact an advanced clerical job.

The Court further finds that the limitation of the plaintiff's employment was not based upon discrimination against females, nor was it based upon retaliation for filing a claim with the EEOC. It was based upon the discretion of the employer to transfer, reassign, or terminate an employee such as was done when Howard Hicks was terminated as Business Manager and the plaintiff was given substantially all of his duties but not his title or salary.

The damages to which the plaintiff is entitled are:

|  | Equivalent of Howard Hicks Salary | Less Amount Paid to Plaintiff | Difference |
|---|---|---|---|
| 10/1/72 to 6/30/73 | @ $858 per month = $7,722.00 | @ $477 per month = $4,293.00 | $3,429.00 |
| 6/30/73 to 7/1/74 | @ $858 per month = $10,296.00 | @ $606 per month = $7,272.00 | $3,024.00 |
| 7/1/74 to 6/30/75 | @ $858 per month = $10,296.00 | @ $708 per month = $8,496.00 | $1,800.00 |
|  |  | TOTAL: | $8,253.00 |

The Court further finds that the costs shall be assessed against the defendant, and that these costs shall include an attorneys fee and expenses for the attorneys for the plaintiff. These fees and expenses are computed and allowed upon the basis hereinafter set forth:

The Court finds from proof of counsel for the plaintiff that 22½ hours were spent by counsel in preparation for trial, not including deposition time. This time consisted of 5½ hours in four client interviews; 5 hours in preparation of Complaint; two pre-trial memos, drafting and filing subpoenas for trial; 6 hours in factual preparation including accumulation and review of records and exhibits; 6 hours in research and witness interviews; and the drafting of 31 letters. The Court further finds that 10½ hours were spent in attending the discovery deposition of the complainant and the taking of the deposition of Dr. Vonne F. Porter on February 14, 1979. The Court further finds that complainant's counsel spent four full days in trial—namely February 21, 22, 23, and 27, 1979—with favorable judgment being given at 6:00 P.M. on February 27, 1979. Counsel also spent 3½ hours on March 12, 1979, preparing proposed Findings of Fact and Conclusions of Law. Thus, the Court finds that counsel spent 27 hours in pre and post trial preparation; 10½ hours in deposi-

tions and four complete days in trial. Due to the complexity of the case and counsel's experience in these cases, the Court is of the opinion that counsel should be compensated for services performed at the rate of $65 per hour for all out of court work and $500 a day for trial days. Thus, the Court will award the complainant's counsel, Phillip E. Kuhn, the total sum of $4,837.50 trial fee, plus trial expenses of $235 representing a deposition bill of $177.50 plus filing fees and postage for a total amount of $57.50.

The Clerk will prepare a judgment for the plaintiff, Ann Ferrell Dacus, in the amount of $8,253 with the costs including an attorney's fee and expenses in favor of Phillip E. Kuhn in the total amount of $5,072.50 being assessed against the defendant, Southern College of Optometry.